Thank you, Your Honor. May it please the Court, and thank you for accommodating this by phone. In accordance with the Court's March 9th letter, I propose to focus on Sodexo's claims for fraudulent inducement, for breach of the 2016 Supplemental Agreement, and for unjust enrichment. The District Court erred in granting summary judgment to Drexel on each of those claims. Starting first with the fraudulent inducement claim, count one of the complaints. That claim should have been allowed to proceed to trial because, contrary to the District Court's analysis, it's not barred by either the Parole Evidence Rule or the Gist of the Action Doctrine. Now, the Parole Evidence Rule... Here, this is Judge Ambrose. Look, it appears that there is substantial evidence in the record, including testimony from Sodexo employees, that Drexel repeatedly stated it didn't know whether it would meet its enrollment goals. Now, in PA, Pennsylvania, which is the law that governs here, you can't show fraud based on future promises unless a statement fostered a belief in a specific indefinite outcome. Could we affirm the District Court's summary judgment ruling on that ground? No, Your Honor, because under Pennsylvania law, statements about future plans or intentions are actionable if the statement knowingly misstates the speaker's true state of mind when it was made. And here, Drexel's statements about future freshman enrollment misrepresented its intentions as to an enrollment. That's an issue that is within Drexel's control. There's testimony, there's citations in the record explaining that Drexel expected the 2015-2016 enrollment to decline, in part because it had made fewer offers of admission. So that's something that Drexel controlled in its representations about steady or growing enrollment for thus unknowing this statement of its true state of mind. And again, as your question suggests, Judge Ambrose, this was not the basis on which the District Court granted summary judgment to Drexel. The District Court granted summary judgment because of the parole evidence rule and the gist of the action doctrines. With respect to those two doctrines, the parole evidence rule only applies where a contract supersedes the party's previous representations and agreements. By contract, if the contract is incomplete on its face or if it's not the party's entire contract with respect to the particular subject matter, the parole evidence rule doesn't apply. Here, if you look at Section 9.1 of the contract, far from expressly disclaiming or superseding reliance on Drexel's representations, the 2015 contract expressly embraces Sodexo's reliance on those representations. It says that each party has relied on representations regarding existing and future conditions and projections made by the other in connection with the negotiation and execution of the agreement. And so the District Court was incorrect to apply the parole evidence rule here because the plain language of the contract contemplates that these prior representations are relevant. The contract is not integrated as to that issue. And you're specifically referring to 9.1? Correct. And again, it's the language in 9.1 that, quote, each party has relied on representations regarding existing and future conditions and projections made by the other. Let me just ask this question. What would the contract have to have said in 9.1 or otherwise for it to be fully integrated? Well, if the contract had expressly disclaimed reliance on past representations, that's a quote actually from the Pennsylvania Supreme Court's decision in the Yucca v. If the contract had expressly disclaimed reliance on past representations, then you'd have a situation where the parole evidence would bar you from looking at it. But again, here you have the opposite situation where the party expressly embraces reliance on past representations, and that's again in Section 9.1. Judge Ambrose, sorry to interrupt. It sounds like somebody disconnected. Can everybody verify who's still on the line? Chief Cosby and Mike Rupert are still on the line. Melissa Brown is still on. Can only the judges and the sign-in attorneys verify? Judge Ambrose? Yes. Judge Vivas? Judge Vivas here. Okay, we're all here. Okay. You can continue. Sorry about that. No problem. So if there are no other questions on the parole evidence rule, I'll move on to the gist of the action doctrine. The fraudulent inducement claim in Drexel's complaint is based on Drexel's breach of a duty that's created by the law of torts and not by the 2015 contract. That's the key factor under the governing Pennsylvania Supreme Court decision about the gist of the action doctrine, which is the Bruno v. Erie insurance case. In that case, the Supreme Court explained that where, quote, an alleged tort claim against a party to a contract is based on the party's actions undertaken in the course of carrying out a contractual agreement and the gist or the gravamen of the cause of action stated in the complaint is in actuality a claim against the party for breach of its contractual obligation. That's where the gist of the action doctrine applies. So it's the nature of the duty that's alleged to have been breached that is the critical factor. Here, we're not alleging a breach of a duty under the contract. We're alleging a breach of a duty not to induce a contract through fraud. That is quintessentially a tort claim. The facts of the Bruno case are instructive and make this an a fortiori case. In Bruno, you had a situation where there was a negligence claim against somebody associated with an insurance company, and the employee of the insurance company committed negligence by providing false information to a homeowner about the consequences of mold. That was a negligence tort claim, even though the relationship between the parties arose out of the insurance contract between them. Here, this is an a fortiori case because the tort that we're talking about, the fraudulent inducement, actually precedes any contractual relationship. That's the very nature of the claim is that the tort was in the fraudulent inducement of the making of the contract. Drexel relies here on the Etole case, which is an intermediate appellate court case that predates Bruno. Bruno, at 106 Atlantic 3rd at 69 footnote 17, expressly considered Etole and chose not to adopt the multi-factor test that Drexel relies on from that case. The gist of the action doctrine here doesn't bar our fraudulent inducement claim either because, again, the gist of the action is in the tortious inducement to enter the contract, not a breach of the duty that arises out of the contract itself. Do you have to win on both paroled evidence and just the action to have the fraudulent inducement claim go forward, or just we could go on either one of those? Well, I think the gist of it. Let's assume that we think fraudulent inducement's a tort claim and, therefore, just the action doesn't apply. My guess is you still have your parole evidence. Well, the other side would still have to make a claim on parole evidence. I think that's right. I think that the district court ruled against us on both grounds in the alternative. Yeah, but I don't understand. Yeah, and so the court would have to agree with us, if I think it should, on both gist of the action and parole evidence. Let me just follow up on that, if I may. Courts of appeal can affirm on any ground. So even if you prevail on just the action and parole evidence rule, don't you still have to state a prima facie case of fraudulent inducement? We do, and we believe that we satisfy all of those elements here. Well, let me kick the tires on that, if I may. You know, I mean, there's these allegations that these affidavits, three of these affidavits that were submitted are sham affidavits. They're contrary to testimony. They're contrary to 30B6 testimony, and they're contrary to other deposition testimony, and they were submitted after the discovery process closed, and they're flat contradictory to that, and that that basis for the contradiction is the primary basis for creating a genuine issue of material fact. So if we take those sham affidavits off the table, you know, allegedly sham affidavits off the table, what about this fraudulent inducement claim has a genuine issue of material fact? The need to continue to the next stage. Let me make two points in response to that, if I could. Yeah, I've got a lot in. Okay, make as many as you want. Am I speaking with Judge Phipps or Judge Amherst? Judge Phipps. So let me make two points in response to that, Judge Phipps. First, with respect to the sham affidavit doctrine, this issue was raised in the district court, and it's a matter of discretion for the district court whether to treat something as a sham affidavit or not, and the district court properly exercised its discretionary determination here not to apply the sham affidavit doctrine. But to get to your other question. But just to tease that out, sorry, I mean, that's still de novo review, right? I think the summary judgment's a de novo review question, and then the evidence that goes forward or into de novo review is sham affidavits would still be under that. Are you proposing that we have an abuse of discretion standard for sham affidavit determinations? I think it is an abuse of discretion standard for whether something constitutes a sham affidavit and is thus admissible for purposes of determining summary judgments. Do you have a case for that, just out of curiosity? I believe we have a case for that in our reply brief. Let me see if I can find that for you on rebuttal. All right. Thank you very much. Unless there's any further questions, Judge Phipps, do you have any further questions on fraudulent inducement? I don't. Okay. May I just? I don't want to wear out my welcome, but I understood that Judge Phipps was also asking if there was additional evidence in the record beyond the affidavits. If I could just answer on that. Yes. Let's pull that up. Go ahead. The affidavits are corroborated by additional evidence in the record, and there are a number of points that I would make on that. One is when Drexel distributed its RFP in 2014, it estimated the number of meal plans that bidders would sell, but at the same time it internally budgeted for a lower freshman class than the estimate in the RFP. An internal memo shows that as of May 2015, Drexel knew that contrary to its earlier representations, freshman enrollment would decline. It budgeted based on that but didn't disclose that to Sodexo before executing the 2015 contract. There is evidence in the record, emails and testimony from Drexel employees, suggesting in various ways, this is in the brief. Some of it is sealed, so I'm not going to quote from it, but in the brief suggesting that Drexel knew that it was keeping something from Sodexo, and the 2015 contract itself suggests that Drexel had made prior representations to Sodexo about enrollment growth. That takes us back to 9.1. So it goes beyond just the affidavits that would support, again, at least for purposes of summary judgment, at least for purposes of showing that there's a triable question, that there is a premutation case of fraud here. Okay. I realize that we mentioned to you about the 2016 supplemental agreement and the unjust enrichment, but I also have some questions. This is Judge Ambrose. Questions on good faith claims. I look at Jenkins, and I once upon a time used to deal a fair amount with lender liability, back in the private world. And Pennsylvania appears to be far less developed than does other jurisdictions. And Jenkins talks about there has to be a, quote, framework, close quote, or somehow somebody to interpret whether somebody was within that framework in order to have good faith. And we're specifically talking about, I guess, here, Section 9.2. What framework does the management agreement provide to interpret the promise, if we are bound by what the Pennsylvania Superior Court says in Jenkins? So, first of all, it provides a clear triggering condition for negotiation. That's less than 2% freshman enrollment growth. And second, it provides a goal for the negotiations, which is countering the adverse economic impact of that subpar growth on Sodexo. To the extent there are additional gaps to fill in, a court could fill them in by looking to Section 9.2, the rest of the contract, and fundamentally to trade or industry custom. And that's consistent with the ways in which Pennsylvania courts and this court have applied good faith commitments before, such as, for example, in the Apex versus Transworld case where the court held enforceable an agreement to negotiate in good faith the final subcontracting prices. That's the Keening Agreement case. And so the good faith provision fits comfortably within the sorts of provisions that have been found to be enforceable. So how would you instruct a jury on the parameters providing Braxel Breach 9.2? So, again, there's no question that the triggering condition is satisfied. I think the only question is, what does it mean to counter the adverse economic impact? And I think we would probably have to have factual development about what is customary in the industry, and that could be the jury could be instructed based on that. All right. Let's go to the 2016 Supplemental Agreement. I can't understand to some extent. Someone says on September 19, in 60 days, as a matter of convenience, this agreement ceases to exist. So it ceases to exist at the end of November 18. And that says later on, oh, if you'll stay an additional 22 days, we'll offer you about $3 more per student and we'll reduce your commission. You respond back, and I don't know if you – but I can't figure out, did you respond back the same day or wait until September 26 saying that the agreement is over today? And, by the way, we're not going to leave students in the lurch. And we'll continue on to December 10. But you don't say, I'm going to accept the reduced commission, I'm going to accept the increased student pay per student. So, is there a meeting of the minds? Is there consideration? Is there, in effect, what happened after September 26? Is there, in effect, a course of conduct that shows that there was some type of agreement as to, we'll continue for the additional – so December 10. And between now, September 26 and December 10, we get paid the additional money. What happened here? So, Drexel sent its offer letter on September 19. Sodexo responded seven days later on the 26th. Sodexo's letter, and this is quoted in the district court's opinion at Joint Appendix 158, Sodexo's letter references Drexel's letter, so it's a response to Drexel's offer. And the key language in Sodexo's letter is that it agrees to Drexel's request that it remain on campus. Its motivation for agreeing, whether it was because it wanted to help students or to help Drexel, isn't relevant. The point is, it agreed to what Drexel was asking it to do. The only difference between Sodexo's letter and Drexel's letter has to do with how the agreement was terminated, whether the 2015 agreement was terminated for convenience or for cause. That distinction is immaterial here. The only distinction under the 2015 contract between the two types of termination, one is a 10-day termination and the other is a 60-day termination, but either way, it's undisputed here that Drexel asked and Sodexo agreed to remain past the 60 days to December 10th. But then the question becomes, does it get the increased per-student pay and the reduced commission? And there's nothing in there that talks about that in terms of the September 26th letter. I don't think there's anything in the law that would have required Sodexo in its letter back to expressly accept, expressly restate those terms in order to accept them. Sodexo was agreeing to Drexel's request, and it was agreeing to do so on the preferred terms relative to the 2015 agreement that Drexel had offered in 2016. The letter accepting Drexel's offer was also accepting the more favorable terms that Drexel was offering at that point. Even apart from the exchange of letters, though, you also have acceptance through performance. Pennsylvania law recognizes that an offer can be accepted by conduct, and here Drexel's letter asked Sodexo to stay on campus past the time that it was obligated to do so under the termination provisions of the 2016 agreement. Can I just follow up on that? This is Fred Phipps. You know, the question I had is, when would those preferred terms kick in? Was if Sodexo says, hey, we want to, you know, Drexel says this is a 60-day termination time period, do those preferred terms kick in only to the additional 22 days afterwards? Do they kick in immediately, or do they kick in after some sort of, you know, 10-day period for termination for cause? So this goes to the terms of Drexel's actual offer letter, which is in the supplemental appendix, I think it's 540 to 541. 540 to 541, and it's at the bottom. Again, this is sealed, so I can't directly quote from this, but I think if you look at the bottom of 541, the additional terms are daily rate and overall commission for the remaining period from September 19th through the end. To the extent there's some ambiguity about that, at a minimum, to the extent there's some ambiguity about that, at a minimum, Sodexo is entitled to more than what Drexel provided it, and so the district court was wrong to grant summary judgment on this claim. Isn't there an argument that your September 26th letter, instead of an acceptance, even though it uses the word agrees, it was a counteroffer? So this goes to what constitutes a meeting of the mind under Pennsylvania law, and to the extent that they counteroffer, the only term that varies is the kind of termination of the 2015 agreement that's at issue. And again, whether you call that a termination for cause, which is what Drexel proposed, or whether you call that a termination for convenience, that's just simply not a material difference here. So you have an acceptance on the key terms, and you have a minor disagreement over something that's immaterial. Under Pennsylvania law, that constitutes an acceptance. Even if it didn't, even apart from the written exchange, though, what you would have here is acceptance by performance, because Sodexo went beyond fulfilling its contractual obligations and, in fact, fulfilled what Drexel asked it to do in the September 19th letter, which was to stay past the termination date of the agreement. Drexel accepted that performance without objection, and so it therefore needs to live up to its end of the deal, which is the term that's offered in the September 19th letter for Sodexo's performance. On this issue, Judge Bevis, do you have any questions for Judge Bevis? Not on this issue. I'm on a different one. Okay. Why don't we go to, then, on Justin Richman? I'm sorry, is this Mr. Joubesky? Yes, that was me. I was just going to ask Judge Ambrose if you wanted me to briefly touch on the consideration question, which I think you also asked about when you first raised the issue. Go right ahead. So, in a sense, I've already touched on this, which is that upon notice of termination by Drexel, Sodexo had to remain on campus at most for 60 days until November 18th, but Drexel asked that Sodexo remain on campus until December 10th, and Sodexo agreed to do so. So providing the food and dining services for those extra weeks beyond what the 2015 contract required in accordance with its termination provisions was legal consideration for the 2016 supplemental contract. Okay. Any further questions on the supplemental agreement issue? Let's go to unjust enrichment. It looks like the district court found that, in effect, it wasn't pled or preserved the unjust enrichment claim. Do you want to address that first? Sure. So the unjust enrichment claim is available for both the 2015 and 2016 contracts, to the extent those contracts themselves are not enforceable. In terms of the pleading, with respect to the 2015 allegations, Paragraph 96 of Count 3 of the complaint incorporates by reference the allegations in the previous paragraph, which includes the allegations of Drexel's bad faith conduct in Count 2, and Count 2 is the 2015 contract. The unjust enrichment claim itself says that Drexel received benefits from SodexoMagic's actions and appreciated and retained those benefits. That, in turn, is not limited to just the 2015 bad faith conduct. It also includes the 2016 related conduct that we were just talking about in connection with the supplemental agreement. And so when you – I'm sorry, go ahead. Sorry, it's Judge Vivas. My concern about that argument is that the timing of the pleading doesn't work. You pleaded this back in September, I think, of 2016. So this is before you could have alleged that there was, in fact, this agreement by performance. So at the time you're pleading it, it's referring only to the pre-2016 events. So it seems a little odd to now use it as a gap filler for the 2016 alleged agreement. And so I think what I would point you to, Judge Vivas, is to the supplemental pleading or the amendment to the complaint. And the whole point of the amendment to the complaint is to supplement the previous allegation. So even though the unjust enrichment claim preceded that amendment, the nature of the amendment is that it's supplementing the earlier allegations to include both the 2015 and the 2016 conduct. Okay, go on. So with respect to the unjust enrichment claims, a reasonable jury could award restitution to Sodexo because Drexel was unjustly enriched by Sodexo's provision of food and dining services at unjustly low rates as a result of Drexel's course of conduct. That includes the fraudulent inducement that led to the 2015 contract in the first place, the failure to negotiate in good faith in order to counter the adverse effect on Sodexo of the enrollment projections falling short and in fact declining, and then finally the unjustly low rates for providing additional services in the late 2016 period. Judge Vivas, again, do we have to worry about your essentially cleats seeking expectation damages here? I mean, should we be understanding this unjust enrichment as really a tort remedy or as a contract in all but name? Which variety of unjust enrichment is this? So I think the unjust enrichment claim is really a combination of – it's a quasi-tort, quasi-contract remedy here. We haven't gotten in, in this case, either in the District Court or in the Court of Appeals to exactly what the remedy would be because, again, the District Court granted summary judgment on liability on this claim. But I think depending on what the theory of unjust enrichment is, depending on which of these allegations we're talking about, the remedy might vary. The unjust enrichment, though, is inherently an equitable remedy. So it would just depend on which contract claim survived. And if a contract claim survived, we wouldn't be seeking the double dip for that claim on the unjust enrichment claim and which contract claims, if any, didn't survive. And then we would have to figure out what the appropriate restitutionary sort of remedy would be under an unjust enrichment theory. In other words, I don't know that there is a single measure of recovery that I can give you in the abstract because it would depend on what's actually at issue in the unjust enrichment claim. And what's actually at issue in the unjust enrichment claim depends on which of the contract claims survived separately. All right. I don't know if the other judges have more on that. If not, I'd like to just ask briefly, am I right that the punitive damages claim just rises or falls on what we make of the fraudulent inducement claim, that there's really nothing else to argue about that, but if we decide that there's a tort claim in here, then it comes back, and if not, then it's gone? Yes, Judge Rivas. That's right. Okay. In light of the Nicholas decision, that would seem to be the case, which is from our court in 2004, I believe, or 2000. Okay. Any further questions for Mr. Trevesky? All right. We've given you about 30 minutes, so let's go to Mr. Kozin then, and then Mr. Trevesky will get you back on rebuttal. Thank you, Eric. Well, if the court please, Steve Kozin for Drexel University. I must make a preparatory comment with your permission, and that is that from the beginning of this case and certainly through the district court proceedings, Sodexo has had the tendency to play rather fast and loose both with the facts and with the law and with their citations or quotations from documents, and as a result, I must spend some time making our position clear and referring to that testimony and to those documents and to that evidence. So I'll be as brief as I can, but I also want to be as precise as possible. This is Judge Ambrose. Why don't we go through the concerns that we have first, and then if you think there's something at the end you need to add. You know, we're not before the trial court at this point, and why don't we just start with the fraudulent inducement issue there. It looks like under parole evidence, now clearly you've got the section, I guess it's 1011, and the argument would be that, hey, that integrates everything. The trouble is that you have 9.1 of the management agreement, and 9.1 does say, in addition, each party had relied on representations regarding existing and future conditions and projections made by the other in connection with the negotiation and execution of this agreement. And it looks like the agreement within the four corners says that there are things outside this agreement that you can rely on by way of representations, and that would seem to be outside the bar of the parole evidence rule. On the contrary, Your Honor, two things to point out. Number one, with respect to 9.1, 9.1 relates to changes in policies and practices. It does not in any way, shape, or form refer to, in its language or otherwise, to any representations with regard to freshman enrollment or any enrollment. It talks about conditions that existed at the time that SodexoMagic commenced operations. Can I push back on that? This is Judge Fitz. Can I just push back on that? You said that 9.1 doesn't reference enrollment, but if I read 9.1, it has a phrase, student population. And it also, instead of in the title, just to add to that, it's not policies and practices. Clearly that's the title, but it talks about conditions in the very first sentence. And the things that it was talking about were those conditions that existed on campus, which for 20 years Sodexo was familiar with on a daily, weekly, and monthly basis. But isn't the question whether we can look beyond the scope? Isn't the question whether we can look at evidence beyond just the pure integration of this contract? I mean, I'm just looking for if 9.1 is the hook that Sodexo is using for saying, aha, we can look beyond that. And one of the phrases that's in 9.1 is client-student population. And then representations, existing future conditions and projections. And I guess the question in my mind is, why doesn't that combination of events open that integration clause, at least for these narrow items listed in 9.1? Well, I don't believe it opens it. It simply acknowledges that during the course of an eight- to ten-month negotiation, the parties exchanged information and they exchanged representations with regard to hours, rates, locations. Remember, this covered catering, it covered outside, non-mandatory meal service, things of that sort. And so what they were doing was setting up and talking about policies and practices, what existed and what would exist, but didn't refer to or relate to freshman enrollment or catering. That is referred to exclusively in the financial assumptions by Sodexo incorporated into 9.2. I think it is rather ludicrous to assume that the language of 9.1 or 9.2 was acting as a reservation of rights, which is what you would have to find in order to... Mr. Cozen? Yes, sir. It's Judge Bevis, and perhaps you're accusing my thinking of being ludicrous as well, but that's a rather strong accusation. I do not read this as saying 9.1 says it's exclusive of 9.2. 9.1 uses fairly general language about representations regarding existing and future conditions and projections made by the other. Now that plugs into Mr. Dvoretsky's argument that Pennsylvania law makes actionable a false representation about a present intention, even if that present intention relates to the future. Now this is not a question about whether to grant summary judgment for Sodexo. Sodexo's argument, as I take it, is that your client had a present intention to reduce enrollment and to have it at 2,800. It made a representation that it was shooting for 3,100. It knew of the inconsistency at the time based on some of the documents in the field appendix. If that's the case, don't we send to a jury to decide whether this is in fact a representation regarding an existing and future condition and projection that your client was saying one thing about internally and a different thing about externally? No, I don't think so, and I was certainly not accusing the court of proposing a preposterous or absurd proposition. When 9.1 talks about the client-student population by way of example, it speaks of it in terms of labor, food and supply costs, and federal, state, and local sales use and excise taxes. Can you point to me the language that limits 9.1 to that? I don't think that the language that limits 9.1 to that is the language in 9.2, because there is no reference in 9.1 to anything which deals with any assumptions or projections with respect to future freshman enrollment growth. And because that is the subject matter of the fraudulent inducement claim here, then 9.1 is self-limiting. It refers to changes in policies and practices. It refers to things that existed on campus, and it refers to things that might occur in the future with regard to those policies and practices. But it does not refer in any way, shape, or form to the financial assumptions that are relevant to the fraudulent inducement claim. As a consequence, it seems to me that it either has to be read totally on its face by virtue of what it says and or is self-limiting, but certainly cannot relate to or refer to the fraudulent inducement claim with respect to a breach of the assumptions that Codenso maintained with regard to freshman enrollment. So that would be my answer to why 9.1 should not be interpreted any way other than what it says and what it does not say. My other point would be that one of the arguments that Mr. Dvoretsky didn't make this morning, but they made in their reply brief, is that 9.1 was in effect a reservation of rights and that it was reserving the right to make a claim for fraudulent inducement with respect to freshman enrollment. I see nothing in the language of 9.1 and, of course, in 9.2 that relates to the issue of freshman enrollment. It does relate to, by way of example, which means there could be many other things, student population. Sure, sure. But then you have all of the testimony. This gets into the original question that Judge Vivas asked, which I certainly want to have the opportunity to answer, is there a prima facie case with regard to any misleading comments, misleading representations, or nondisclosures that related to the issue of freshman enrollment? And I would suggest to you that given the uncontradicted testimony throughout this case, that from July when the original RFP was propagated and the BOFO was propagated, that the meeting with Sodexo took place where they received our strategic plan. Throughout all of those meetings and throughout all of the pre-contract negotiations that led up to the May 2015 contract signing, we have multiple examples of Sodexo senior management stating that they knew that freshman enrollment would not increase, that they knew that there was a new retention policy which might have some adverse effect on freshman enrollment for a short period of time. This sounds to me like it's an argument you can make to the arbitrator if this were to go back. Well, it's not an arbitrator. It would be to a jury. I thought there was an agreement that if – or maybe – let's clarify that. Let's go back. Yeah, I'm sorry, Your Honor. No, the arbitration, it was only with respect to those remaining claims in count five as to which there was agreement, and an arbitrator is going to handle that. It has nothing to do with counts one, two, and three. Okay. Now, on this one, it just seems to me when you look at the merger or what I sometimes call the integration clause in 1011, the agreement contains all agreements of the parties with respect to the matters covered here, and superseding all prior agreements may not be challenged other than by an agreement in writing. What we're talking about in 9.1 is not an agreement but a representation, and that seems to me that can Sodexo say that there were, as Judge Beebe says, false representations about current projections on which would be based future conduct, and so it doesn't seem that the parole evidence rule necessarily applies here by virtue of the way the contract, the management agreement, is drafted. I would take the contrary position, Your Honor. I would say that the parole evidence rule does apply because what we're being accused of misrepresenting on some current representation or some current potential misrepresentation goes to the issue of freshman enrollment. That issue is barred under Pennsylvania law with respect to any claim for a fraudulent inducement to enter into an integrated contract, whether the integration clause itself makes the contract fully integrated or whether the 100-plus page contract with eight to 10 months of negotiation and dealing with every issue also does that. Mr. Costa, it's Judge Beebe, and you are right. We have sophisticated parties. We have a long contract. But in those circumstances, this is not a consumer contract where we might think it wasn't carefully worded. The wording of this contract is different from the wording. You know, your best authorities might be YACA and HCB contractors. Both of those Pennsylvania cases involved merger clauses that spoke of superseding any representations or agreements, or HCB was all prior negotiations, representations, or agreements. Shouldn't we give way to the narrower wording of this merger clause? Your client could have bargained for a broader merger clause. You were individually bickering this whole contract, and that's not the wording that the parties chose here. The answer, I think, Judge Beebe, is no. It dealt with the subject matter that we are talking about in terms of the fraudulent inducement claim here, and I would say Judge Dalziel's analysis in the de Bernardin case is pretty clear on that and I think substantiated by Pennsylvania law. When you're talking about prior fraudulent oral misrepresentations or representations respecting a subject matter that is specifically dealt with in the written contract, you cannot introduce parole evidence. The point that I make, and I think I made previously, but perhaps not as articulately as I would have liked to, is that where you have an entire Article 9 that deals with financial adjustments and where 9.2 expressly addresses freshman enrollment growth, which is the gravamen of this complaint, 9.1 cannot be interpreted to include that within its broad general language regarding present conditions, including client-student population, labor, food, and supply costs. All right. You make the argument with some force. You say 9.2 deals with this specifically. We'll hear from Mr. Dvoretsky on rebuttal, but I suppose the counter would be, well, what is it that makes 9.2 exclusive of 9.1 rather than 9.1 being a general principle and then 9.2 being a more specific application of the understanding that the parties aren't going to be locked in when something like student numbers have changed. Can you point me to something that really drives home that 9.2 is supposed to be exclusive of rather than building on and complementing 9.1? The history of the negotiations and the specific testimony of Nancy Arnett, which we've referred to in our brief, which – Can I just intervene? It sounds to me that your point is that parole evidence shouldn't be permitted to interpret the contract because there's a merger clause, but in response to Judge Vivas' question, you point to items beyond the contract. Well, every contract has to be interpreted based upon some outside evidence to understand what the nature of the claim is before you can make the determination with regard to – Isn't that all SEDESTA is asking for? No. Isn't that just their ask to say, look, the outside evidence we'd like are the representations that we think that were made to us about future – I mean, it sounds like what you're saying is that it would be included. No, I don't think that's what they're asking for. What they're asking for is without the evidence, which I will get to if you allow me, without the evidence to support it, what they're asking for is an opportunity to present parole evidence with respect to fraudulent inducement regarding freshman enrollment, which is not dealt with in paragraph 9.1, but is dealt with specifically and exclusively in 9.2. We all know the rule that when you have something specific, it is predominant over that which is general, and it seems to me that that's why I say 9.1 is self-limiting and cannot be used as a door to open to allow in parole evidence. And I'm not sure what the parole evidence would be that they want in, except what they said in their brief and in their oral argument, which was evidence of fraudulent inducement with respect to freshman enrollment. That's not addressed in any way, shape, or form and by any language in 9.1. But 9.1, if you want it specific, it says Drexel student population. No, Drexel student population, Judge Ambrose, was referred to in the RFP. That's a total general population. In the RFP, it said we had 27,000 in this year. We hope to grow it to 29,000 or 27,000 in the subsequent year and then up to 30,000, but it doesn't talk about freshman enrollment at all in the RFP. Well, Judge Phoebus, but, you know, freshman enrollment is one major driver of overall student population. That's where the bulk of new students come in. So you could logically understand that as a component. No, actually that's not the case. What is the case is that you have graduate students, you have online students, you have non-mandatory people who don't live in the residences, non-mandatory meal services. It's all laid out in all of the testimony, which was the subject matter of our motion for summary of judgment. And what they were complaining about improperly, because it's totally contrary to the testimony, which I'd be happy to get to, to their admissions. What they were complaining about was that they didn't understand that some of the freshman enrollment might go down because it's only freshman residences who are So you're talking about, you're talking about, when you talk about the Vendor Vendee Contract, you're talking about meals at the urban eatery and other outside venues. You're talking about catering service, which under the agreement was totally non-exclusive. You're talking about non-residents buying meals. And, in fact, they made it clear in the contract that Sodexo was going to have to use its best efforts to go out and expand and sell those non-mandatory types of services. So I think there is no basis in the testimony, in the contract itself, with respect that would support the notion that 9.1 refers to the gravamen of the complaint that is made in this case. So it seems to me that what you keep talking about is if parole evidence is allowed, that I still win. That's not the issue before me. The issue is parole evidence from their side and ultimately from your side. Can it come in or are we limited to the agreement? What I'm hearing you say by virtue of referring to that parole evidence is that's pretty much what you want it to happen as well as does Sodexo. No, what I'm saying is that the law in Pennsylvania is clear that this is a written contract which is fully integrated and unambiguous, and that a party may not offer parole evidence in support of a claim that they were fraudulently induced to enter into that contract. But having once upon a time in another life drafted a lot of merger clauses, if one refers simply to agreements and not to representations and warranties and things like that, then representations, in this case, are allowed to come in. And specifically 9.1 talks about representations. Okay, Judge Ambrose, I would suggest to the contrary, that Pennsylvania law would not allow that. That Pennsylvania law would not allow that. What does Pennsylvania law say with respect to representations? Remember the fact patterns in HBC and Yucca dealt with a merger or integration clause that pertains to, among other things, representations. Here it does not. Yeah, but I think you've got to look. You can look beyond that. You can look to Blumenstock, and you can look to the language of Toye as well in distinguishing between fraud in the execution, fraud in the inducement. And I think those cases make it clear, and as I say, the DeBardin case opinion by Judge Delsa applying Pennsylvania law makes it clear that if the subject matter is dealt with in an integrated contract, whether the integration clause is interpreted one way or the other is irrelevant. If the contract is fully integrated, which it clearly is, then under those circumstances the parole evidence does not come in. I get nervous when an advocate uses the word clearly. This is Judge Bebich, because it suggests to me that there's not more there. I think to put a sharper point on the point Judge Ambrose was already making, your point is that if there were no integration clause, merger clause, we might find it nonetheless integrated. I think Judge Ambrose's point might be extended to say that when you have an integration of merger clause that says we go this far but not further, there's a negative inference to be drawn that the parties decided not to go as far as integrating representations. I don't think you have a case in which a court had a merger clause that affected only agreement but nonetheless extended its representations because, as you rightly say, the contract is 100 pages long and it's comprehensive and other things. I think there might be a negative inference to draw from the omission of representations there and then the dealing with representations in 9-1 and 9-2. There is no evidence in this case offered by Sodexo that at any time during the negotiations that distinction was made. These provisions largely emanated from Sodexo's negotiator and particularly 9-1 and 9-2 emanated from Sodexo's negotiator. Not so much 9-1 but 9-2 because she always wanted to get in a guarantee or a commitment with regard to freshman enrollment and later just as throw-in catering but mostly freshman enrollment. And she couldn't get it because the DREXEL representative said, no, we will never agree to that. So if you want to indulge in what I would think is non-evidentiary fanciful thinking about whether or not so many things can sit on the head of a pen, I guess you can do that. But to me, that doesn't make sense as a matter of even contract interpretation under Pennsylvania law. You have a specific provision clearly requested by Sodexo in 9-2. 9-2 is the key for them. 9-1 is an afterthought which they didn't argue in the summary judgment argument at all. The transcript is there for you to see. But on appeal, they raise it as well. You know, representations generally weren't referred to. Only agreements were referred to in 10.11. And consequently, it's not fully merged. That seems to me to be an attenuation of reasonableness. And I can't – there's no evidence to support it, none. All right. Why don't we be giving you about 30 minutes just on the first issue? So let's go to the 2016 supplemental agreement. And if people have questions on anything further on the injuries, we can come back to it. Sure. May I assume, Judge Ambrose, that with respect to good faith and gist of the action, you don't need me to address that? I don't have any significant questions pertaining to gist of the action, unless any of my colleagues do. No. Okay. I'm simply going to point out to the court that, if I may, and then I'll get right to your question, if I may, that Bruno – Justice Todd, in footnote 14 and 17 in Bruno, did not say that – although she was asked to – say that ETOL was wrongly decided. She refused to do that and said she found that it was consistent with what they were requiring here and did not reject the inextricably intertwined case, which has been used in all post-Bruno – in many of the post-Bruno cases, particularly in DePue and others, by the district courts in our circuit. So there's no question that what they're accusing us of, even though they don't have an evidentiary basis for it, is something that was clearly the subject matter of what went into the agreement in 9.2. Now, with respect to the September alleged agreement, I do have some personal knowledge of that, because, as you will see, the September 19th letter was written by me. I suggest that this court take a look at page 2 of the letter so that you can see what I was talking about, including my language that said, we have to attempt to control our own future and create certainty. Accordingly and regretfully, we exercise the right of termination by convenience under 3.1.C, effective December 10, 2016. Effective December 10, 2016. Now, that was more than 60 days, but we read it as we had to give them at least 60 days' notice. So we said we'd make it effective December 10, 2016. I said, while we're only required to provide 60 days' notice, it is provided as much notice as possible as part of its continuing good faith towards the DexO magic. And then I said, as an extension of good faith, if you say to December 10, here's what we'll offer you. Now, when they came back, they didn't address that at all. What they said was, we're terminating for cause today, and the next day they filed their lawsuit. They didn't use the word agree. They said they were agreeing. No. Excuse me, sir. Excuse me. They didn't say that. Here's what they said. They said, because the DexO does not leave students in midterm, i.e., not because you offered us something new and additional, not because we think you don't have the right to cancel for convenience, but because we don't leave students in midterm, we agree to remain on campus until December 10. So, in effect, there's no doubt, at least we thought at the time, that they had sued us the next day. We thought at the time, and still think, that the DexO rejected our termination, asserted its own right to terminate for cause that very day, filed its lawsuit the next day, did not discuss, acknowledge, refer to, comment upon, accept, or reject Drexel's offer. It simply stated, because we, the DexO, don't leave students. We'll step. It didn't say, but we accept your proposal and we'll work under it. It didn't say, if your termination for convenience is effective, we have to stay until December 10 anyway, but we'll only do so if you pay us a higher rate or charge us a lower commission. It didn't say, what's the deal? It just sued. But then what happens, there's two things that could possibly argue against that. One is that, inartfully, they did accept, by using the word agrees. We don't have to decide that necessarily, because that may be something a jury needs to decide. Number two, there may be a course of conduct post the September 26 letter that indicates that there is an agreement, that they go forward and they will go on through December 10, and in that context, they will get paid roughly $3 a student more and have a reduced commission. Now, I'm not saying that's right or wrong. I'm just saying, is that really for a court to decide at summary judgment? I think it is for a court to decide at summary judgment, because I think here it's clear there was no meeting of the minds and there was no consideration. In staying, at least until December 10, based upon our notice of termination for convenience, they were just doing what they were already obligated to do. They were not obligated to stay past November once they terminated. Well, is the question whether or not their termination for cause was correct, or whether our termination for convenience was correct? If they have the right to terminate, they don't have to stay past November. They certainly can terminate for convenience by November, and yet they stay from November until December. So why isn't that consideration? They would have had to stay, even if you start on the date of my letter of September 19. They would have had to stay to December 19, although we did say if they agreed to our proposition, we would pay them from December. Well, let me just interrupt on this, because it sounds like there's no way that your proposition, under your theory, could ever be consideration, because you're saying that they had to stay, we offered them more to stay, and then when they eventually stayed, which they had to do apparently, they can't then get the more because there was no consideration for the preferred terms, because they had to do it anyway. So it sounds to me like this last paragraph on page two of your letter can never be consideration. It's just almost like a dangler that I guess has zero contract value. How could they, how could Sodexo ever avail themselves of this with consideration, since you're also telling us that they had to stay? Because we can modify that by an agreement between the parties. But what's the consideration for the modification? Modifications still take consideration. What's the consideration for that? We would have the payment, the additional payment to them, would be the consideration for that modification. Since they did not accept and simply went ahead for a different reason to stay there, I think under the Kohler case, this is not consideration, and I would also point out that we certainly paid them according to the contract provision and we returned the unamortized portion of their capital investment when it was due, which was about $11 million. And it seems to me that we're reading more into the issue of consideration than it deserves. If they stayed and got paid according to the contract because they didn't accept our offer for them to stay and work under our proposition, but for a totally different reason, that would have been a different situation. But they didn't do that. What they did was they filed a lawsuit that sought damages under our underlying management agreement, not under some September 16 agreement, which didn't come up, my recollection serves me correctly, until they filed their supplemental complaint. So they didn't even sue for it. Although if you have a course of action for an agreement that's been rescinded and there was some conduct that you perceive was a violation of that agreement or a tort claim that relates to the inducement pertaining to that agreement, you still go forward even though the contract is still possibly a viable claim, even though the contract no longer exists. Right? It has to be. Well, I guess you have that alternative. But that's not what happened here. That's not what happened here. Now, I know I've used a lot of the time of the court mostly trying to answer your questions. On the unjust enrichment, why didn't Sodexo's explanation of its unjust enrichment claim at the summary judgment hearing provide adequate notice of its legal theory, given that we don't require a legal theory to be fully developed in the pleading stage? Well, it was not adequate notice of their legal theory because what they said was that they abandoned that oral argument on the motions for summary judgment any tort-based unjust enrichment claim. That's at pages 39 and 40. They totally abandoned it. And then they went further. If you look at page 38 of the transcript all the way through to page 41 of the transcript, they make it clear that the only unjust enrichment claim that they have, which is based not on a tort but on some quasi-contract theory, outside of count five was the September 2016 alleged contract that we just discussed. That's it. That's it. But I'm looking at JA-144 and also 155. It looks like Sodexo's complaint taken as a whole did allege that Drexel retained benefits under the 2016 supplemental agreement. And it's unjust enrichment claim in the alternative to the breach of contract claim. And then 155 incorporates the allegations of a bad faith conduct, et cetera. Go ahead. No, I'm saying if you take a look at what I would say is the waiver or estoppel, although I don't think we have Third Circuit cases which would recognize it as an estoppel but certainly as a waiver, they say they are limiting count three to that exchange in September of 2016. They say, yes, that's what we're doing. And Judge Balson said, well, wait a second, I don't understand this. I thought that count three was alleging that if the court were to find there was no breach and that is the gist of the action doctrine void your tort claim and there was no breach under count two, that's a good faith count, that you were relying on unjust enrichment theory for the same damages that you alleged were due under counts one and two. Am I not right? Mr. Fazio, I don't believe so, Your Honor. And he said, all right. And Mr. Fazio said, I don't think we can, to be honest with you. And then Judge Balson, with due respect, clearly addressed the quasi-contract assertion or potential assertion in his opinion anyway out of an abundance of caution. But he did say to Mr. Fazio, so outside of count five, but outside of count five, what I said was correct. And Mr. Fazio said, outside of count five, which is a count which seeks unpaid invoices and things of that sort, and outside of Mr. Cozen's letter, that's the September 2016 alleged agreement, yes. So there is no unjust enrichment claim here except, at least by their statements in court, unless you're talking about count five or the September 2016 agreement. So in effect, it sounds like what I'm hearing you say is that Sodexo preserved its unjust enrichment claim based on a quasi-contract theory. Only as to the September 2016 alleged agreement, because if that turned out not to be an agreement, then they were attempting to preserve their quasi-contract claim, saying, well, we rendered a benefit, and that benefit was an unjust enrichment, which means that it not only has to be a benefit, but it has to be that the enrichment has to be unjust. And I think that's what Judge Bailson referred himself to, because I think he held quite clearly that a quasi-contract, which is invoked when a plaintiff seeks to recover for a benefit conferred under an unconsummated or void contract, the doctrine does not apply where, as here, a written or expressed contract exists. So there can't be a tort claim, and there can't be a quasi-contract claim, except with respect to the 2016 alleged agreement. Now, by the way, Your Honors, and I want to make sure that this is clear, Sodexo did not pursue any argument in the court below at the time of summary judgment related to the alleged pension withdrawal liability under the MAPP. We think as a matter of fact and as a matter of law, that claim really doesn't exist. They did not also raise it not only at the time of the summary judgment argument, they did not raise it again in their opening brief in this court, and they did not raise it again in their reply brief in this court. And so I will not address it unless you want me to. We have no questions. I have no questions for that. And Judge Rebus has a question to follow up. Judge Rebus, I think you had a question to follow up on. I do. I'd like to just ask you the same question I asked your adversary, Mr. Dvoretsky. Is it correct that there's not really any independent analysis to do here on punitive damages, that that's going to rise and fall on what we decide about the fraudulent and inducement claim we were discussing earlier? If it's contract, you could get it. If it's over sort, you could get it. If it's contract, you can't. Yes. There is no punitive damages claim at all under all the facts of this case. And certainly, if the tort claim goes, the punitive damage claim goes. Right, but if the tort claim stays. You understand it also goes to what Judge Rebus asked Mr. Dvoretsky in the first instance, which is, what was the primacy case of fraud? Where was the fraud? If you can't prove that there was a fraud here, then punitive damages does not come in under Pennsylvania law because it's clearly not recoverable in a breach of contract claim. There has to be a predicate tort claim. So if the fraud claim fails, the punitive damage claim necessarily fails, but you have to prove that there was a fraud. Let's assume that what we're saying, the question is, you're correct. But that only gets you so far. If you allege a fraud claim and you can prove a fraud claim, which is a tort claim, you can get punitive damages. That's if you're not conceding that there is a tort claim here, but if there's a tort claim here, is there any reason the punitive damages claim would not likewise go forward? I would contend that they have not asserted and the evidence doesn't establish, even if they were allowed to go to a jury on their fraudulent inducement claim, that the conduct that they have asserted and what the evidence has induced during discovery, which they don't deny, is insufficient to satisfy the requirements for punitive damages. Let me jump in here, Judge Ambrose. Is there any further questions that anybody has on any issue at all? By the way, I take it then that you don't see any necessity for me to walk you through why there is no viable misrepresentation or nondisclosure claim? What we're focusing on is the fraudulent inducement, the breach of the contract for the supplemental agreement, if there was a supplemental agreement, the unjust enrichment. Those were our principal issues, the good faith. At one point, I had some questions I'm not sure I necessarily do at this point, and so we've given you almost 52 minutes, way more than Mr. Dvoretsky. Unless there's something we have absolutely missed, I'm not particularly interested in any argument that otherwise would be made on the merits because that's not what an appellate court is for, and oral argument is essentially defensive. Judge, you tell me what your concerns are. I'll respond to them. The question is from my colleagues, are there any additional questions or concerns they have that should be addressed? No. No. Okay. Thank you very much, Mr. Tozin, and then we'll hear from Mr. Dvoretsky. Thank you, Your Honor. I think I can be brief, but of course I'm happy to take any questions and answer them for as long as the court would like. With respect to the parole evidence rule, Section 9.1 is a broad pronouncement about representation, and it says that each party has relied on representations about existing and future conditions and projections made by the other side. Among the subjects of that clause, by way of example, is student population, which is synonymous with freshman enrollment, and so 9.1 by its terms contemplates parole evidence about that. Now, 9.2 provides additional protection for Sodexo with respect to Sodexo's assumptions as opposed to 9.1, which is talking about both sides' representations, but nothing in 9.2 should be read to make it exclusive or to give 9.1, which by its terms, again, is quite broad and unduly narrow reading. Mr. Kozin's argument this morning depends heavily on parole evidence, what representations were made, what Sodexo did or didn't know. Those are ultimately questions for the jury, not for the court to decide on summary judgments. And then lastly, on parole evidence, again, unless there are any questions, I promised Judge Phipps a site on the sham affidavit point on page 5. If this is the Daubert site, I think I've got it. Is it Daubert? Is that what you were thinking of? It's the In Re of Vandia Marketing Sales Practices case, page 5 of our reply brief. It's 639 Federal Appendix 874. And I won't belabor it, but in that same paragraph, the reply brief also explains why there isn't even any inconsistency between the affidavits on their face and the testimony that's in the record. With respect to the 2016 agreement, there are two distinct questions here. One is, why did we agree? And that's perhaps not out of goodwill towards Drexel at that point in the relationship, but because Sodexo takes care of students. And then there's a second question of what we agreed to. And the only possible thing that we agreed to here is Drexel's offer in the September 19th letter. The fact that our motivation for agreeing was that we don't leave students midterm doesn't mean that we're foregoing the extra compensation that Drexel put on the table in that September 19th letter. And then lastly, with respect to the unjust enrichment claim, pages 49 to 50 of our opening brief walk through the explanation of what happened in this hearing before Judge Bailson. The premise of the court's questions was that if there is a valid contract and there is no breach, are you still pursuing an unjust enrichment claim as to the 2015 contract? Well, in that situation where there's a valid contract and no breach, no we're not. But that does not forego the unjust enrichment claim as to the 2015 contract for all purposes. It's just on that hypothesis. In any event, the district court went on to decide on the merits, whether the unjust enrichment claim was viable. It just did so incorrectly because of the reading of the complaint that we discussed earlier. Can I just follow up quickly on this notion that it might have been waived? If I understand what your argument is, it's that in the district court you were saying that unjust enrichment isn't an enhancer or an entitlement to additional damages that wouldn't otherwise be available under contract. So to the extent there was a waiver or a cap at the district court level, is it your position that that waiver or the cap was that the damages that we could ever receive under unjust enrichment cannot exceed the damages that we could receive under contract? I think that's right. Okay. All right. I have no further questions. Any further questions from my colleagues? I've got nothing further. Neither do I. All right. Everyone, thank you very much. Very, very well presented argument.